## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**TRACIE MITCHEM-GREEN,**

                                                              **Case No.: 3:20-CV-00054-J-39PDB**

       **Plaintiff,**

**v.**

**MHM HEALTH PROFESSIONALS, INC.,**

       **Defendant.**

_____/

## PLAINTIFF'S CORRECTED RESPONSE AND MEMORANDUM
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff, TRACIE MITCHEM-GREEN, through her counsel, hereby files this Corrected

Response and Memorandum in Opposition to Defendant's Motion for Summary Judgment and

states the following.

### PLAINTIFF'S STATEMENT OF DISPUTED FACTS MATERIAL TO HER CLAIMS

      Plaintiff, an African American female, began her employment with Defendant on January

3, 2017 and worked at the Suwanee Correctional Institution as a Clinician at the time of her

wrongful termination on September 23, 2017. [Ex. 26][1]. Plaintiff possesses a Doctorate Degree in

Nursing (DMP). [Ex. 40, Mitchem-Green Dep. Volume I, 11:4-7; Ex. 41, Mitchem-Green Dep.

Vol. II, 84:15-18]. Despite Plaintiff's stellar work performance during her employment with

Defendant, Plaintiff was subjected to disparate treatment, different terms and conditions of

employment, and was held to a different standard because of her race (black), gender (female), and

because Plaintiff reported Defendant's unlawful employment practices and was subject to

---

[1]    Plaintiff has not referenced every exhibit in the Notice of Filing in this Response, but has
included all exhibits attached to any deposition included in the Notice of Filing.

retaliation thereafter. [Ex. 41, Mitchem-Green Dep. Vol. II, 59:20-25, 179:17-24; Ex. 47, Pltf. Aff., ¶ 4]. Moreover, Plaintiff disclosed and/or objected to Defendant's violation to one or more laws, rules, and/or regulations and became the victim of retaliation thereafter. [Ex. 41, Mitchem-Green Dep. Vol. II, 148:16-25, 17:1-2, 179:25, 180:1-3].

The disparate treatment came at the hands of specifically, but not limited to, Warden Walker Clemmons, a white male, Health Services Agent Brandice Corbin, a white female, and Staff Physician Dr. Denis Vilchez, a Hispanic male. On or about January 20, 2017, Defendant began their disparate treatment of Plaintiff by way of showing preferential treatment towards non-black and/or non-female employees. [Ex. 47, Pltf. Aff., ¶ 7]. Specifically, Defendant showed Plaintiff a lack of support regarding her daily tasks and some of Defendant's written and verbal orders were being applied to Plaintiff alone. [Ex. 41, Mitchem-Green Dep. Vol. II, 144:1-5]. By way of example, every institutional Clinician employed with Defendant, except for Plaintiff, was a non-black male and had at least one assistant to help with their workload. [Ex. 41, Mitchem-Green Dep. Vol. II, 143:15-17]. Plaintiff, on the other hand, was never provided with consistent assistance to her workload. [Ex. 41, Mitchem-Green Dep. Vol. II, 142:14-18]. On multiple occasions, Plaintiff requested to be assigned an assistant, as her workload was too much to handle by one (1) person alone, yet Defendant ignored her requests. [Ex. 47, Pltf. Aff., ¶ 10].

During the summer of 2017, Defendant began to reprimand Plaintiff whenever a patient's medical condition justified a longer patient care time. Specifically, Plaintiff would occasionally spend longer time with a patient, as their medical condition warranted a longer time of care. [Ex. 41, Mitchem-Green Dep. Vol. II, 181:11-18]. However, Defendant contended that Plaintiff must only spend fifteen minutes with any one patient, regardless of the severity of the inmate's health issues. [Ex. 42, Bridges Dep. 13:3-19]. Defendant wanted its employees to see and treat upwards

of thirty patients a day. [Ex. 42, Bridges Dep. 12:9-25, 13:1-2]. Plaintiff subsequently objected to Defendant's directives regarding patient care times, as Plaintiff knew this to be in violation of 42 USC §1983 by way of acting with deliberate indifference in regard to inmates' medical conditions and/or medical care. [Ex. 47, Pltf. Aff., ¶ 14].

On July 12, 2017, Plaintiff emailed Warden Clemmons reporting her recent treatment and her concerns with Defendant's patient care. [Ex. 9]. Specifically, Plaintiff reported her lack of nursing assistance, lack of charts being prepped prior to Plaintiff caring for a patient, and the substandard care that Defendant provided the inmates. [Ex. 9]. Plaintiff also reported that Incident Reports regarding inmate abuse had never been investigated and often nurses would refuse care to inmates which was in direct violation of §954.6034, Florida Statutes, which regulates minimum health care standards for inmates, however, Defendant took no corrective action and Plaintiff was the victim of continued retaliation thereafter. [Ex. 47, Pltf. Aff., ¶ 17].

Several days after the incident referenced above, Plaintiff filed an EEOC charge that in which she claimed she was the victim of discrimination based on race and gender. [See Ex. 23]. The charge filing date was July 17, 2017.

On July 18, 2017, Plaintiff sent a follow up email to Defendant's Corporate Representatives, Human Resource Director Lynch, further reporting the failure to investigate alleged inmate abuse. [Ex.15; Ex. 43, Campbell Dep. 12:11-16, 13:12-18]. However, to this day, Plaintiff has not been notified of any investigative reviews regarding the inmate abuse. [Ex. 47, Pltf. Aff., ¶ 19]. Moreover, Plaintiff further disclosed her discriminatory treatment by way of providing Director Lynch with details of each discriminatory act taken against her. Specifically, Defendant hindered Plaintiff from working in the infirmary and conducting confinement rounds, whereas all male non-black Clinicians were permitted to perform work in these areas. [Ex. 47, Pltf.

3

Aff., ¶ 21]. Moreover, Defendant excluded Plaintiff from the weekly provider meetings, yet male Clinicians were still requested to attend. [Ex. 47, Pltf. Aff., ¶ 22].

On August 29, 2017, Plaintiff further reported to institutional and regional administrative personnel, including without limitation Chief Health Officer Dr. Alexis Figueroa, a Hispanic male, that three (3) inmates were abused by Defendant's employees. [Ex. 17; Ex. 41, Mitchem-Green Dep. Vol. II, 121:18-20, 138:7-25, 139:22-25, 140:1-5; Ex. 46, Rodriguez Dep. 12:20-25, 13:1-5]. However, Defendant took no corrective action. On the morning of August 31, 2017, after no corrective action was taken by Defendant, Plaintiff reported the inmate abuse and lack of standard inmate care to the Suwanee County Sheriff's Department as Plaintiff knew this to be in violation of 42 USC §1983 as stated herein. [Ex. 41, Mitchem-Green Dep. Vol. II, 120:9-17]. Because Defendant's upper management condoned, ratified and otherwise neglected or refused to address the misconduct regarding the correctional institution's numerous violations, Plaintiff repeatedly opposed Defendant's actions and inactions through voiced opposition and various disclosures and complaints which are to be afforded whistleblower protection. [Ex. 47, Pltf. Aff., ¶ 25]. However, Plaintiff faced further retaliation after Defendant discovered Plaintiff had disclosed Defendant's violations or suspected violations of one or more laws, rules, and/or regulations. [Ex. 41, Mitchem-Green Dep. Vol. II, 136:11-13, 149:7-13].

On August 31, 2017, Plaintiff was called into a meeting with Regional Director Campbell, Dr. Vilchez, Dr. Alexis Figueroa, and Health Services Agent ("HSA") Diane Parrish regarding Plaintiff's recent reporting of inmate abuse. [Ex. 47, Pltf. Aff., ¶ 27]. Regional Director Campbell thereafter stated that he received a report from Warden Clemmons and asked Plaintiff if she had reported her concerns to an outside agency. [Ex. 47, Pltf. Aff., ¶ 28]. Plaintiff responded affirmatively, as she had called the Sheriff's Department earlier that same day to report the inmate

abuse after repeated objections and/or disclosures to Defendant directly with no corrective action taken. [Ex. 41, Mitchem-Green Dep. Vol. II, 120:7-10, 178:5-25, 179:1-7].

In direct evidence of retaliation, Regional Director Campbell subsequently alleged that Plaintiff's reporting was a false allegation to cover up Plaintiff's poor work performance. [Ex. 47, Pltf. Aff., ¶ 30]. Later that same day, an hour and a half after learning of Plaintiff's reporting to an outside agency, HSA Parrish called Plaintiff and requested that she stop working, clear out her office, and meet her in person. [Ex. 41, Mitchem-Green Dep. Vol. II, 117:2-16, 179:8-11]. HSA Parrish had been called by Warden Clemmons complaining that Plaintiff had contacted the Suwannee County Sheriff's Office to report inmate abuse. [Ex. 44, Parrish Dep. 13:14-25, 14:1]. Warden Clemmons called HSA Parrish back that afternoon and said that he wanted Plaintiff to be under investigation of Plaintiff and wanted her to depart the institution. [Ex. 44, Parrish Dep. 14:2-25; Ex. 41, Mitchem-Green Dep. Vol. II, 117:20-22, 118:10-19, 179:8-16]. Warden Clemmons told HSA Parrish that he wanted her to depart the institution because she reported the inmate abuse to an outside law enforcement agency. [Ex. 44, Parrish Dep. 14:24-25, 15:1-2, 37:24-25, 38:1-15]. HAS Parrish escorted Plaintiff to her locker, confiscated her items including but not limited to her notebook, and escorted Plaintiff to her car. [Ex. 41, Mitchem-Green Dep. Vol. II, 119:1-16, 13-16; Ex. 44, Parrish Dep. 20:20-25, 21:1-22]. However, Plaintiff was never told the reason for the investigation. [Ex. 41, Mitchem-Green Dep. Vol. II, 118:20-22].

On September 1, 2017, Plaintiff returned to work to inquire about the formal paperwork regarding the reason for the investigation. However, HSA Parrish contended that no paperwork would be given out until the investigation was complete. [Ex. 44, Parrish Dep. 22:14-22]. Plaintiff then spoke with Regional Director Campbell who contended that Plaintiff should have been given the investigation paperwork. Nevertheless, Defendant never provided Plaintiff with a copy of said

paperwork. [Ex. 47, Pltf. Aff., ¶ 36]. Later that day, Plaintiff spoke with Vice President ("VP") Love, and Ms. Parish, whom stated Warden Clemmons was suspending Plaintiff without pay. [Ex. 41, Mitchem-Green Dep. Vol. II, 157:17-21]. VP Love subsequently advised Plaintiff not to enter Defendant's building. [Ex. 47, Pltf. Aff., ¶ 34].

On September 1, 2017, Plaintiff emailed several employees within Defendant, including without limitation DOC Regional Director Erich Hummel, requesting paperwork regarding her suspension. However, Plaintiff was met with no response. [Ex. 47, Pltf. Aff., ¶ 37]. On September 6, 2017, Plaintiff forwarded the same email to Centurion's Executives Mr. J. Campbell, Mr. (f/n/u) Pinkert and Mr. (f/n/u) Wheeler. However, once again, Plaintiff was met with no response. [Ex. 47, Pltf. Aff., ¶ 38]. On September 14, 2017, as she had still not received a response from anyone within Defendant's offices, Plaintiff sent a follow up email to several people, including without limitation DOC Regional Director Erich Hummel and Secretary Julie Jones, regarding the suspension. [Ex. 47, Pltf. Aff., ¶ 39]. Specifically, Plaintiff requested written documents regarding the basis of her suspension, full reinstatement to her position as Clinician with Defendant, and the return of all documents/items that had been confiscated by HSA Parish on August 31, 2017. [Ex. 47, Pltf. Aff., ¶ 40].

On September 15, 2017, Plaintiff received an email from Warden Clemmons stating unspecified concerns about her and he again recommended Defendant not allow Plaintiff to return to work until the investigation was complete. [Ex. 35]. However, Plaintiff had still not been given any details regarding the investigation. [Ex. 47, Pltf. Aff., ¶ 41]. On September 18, 2017, Plaintiff received an email from Human Resources Director Lynch stating, "We are attempting to gather all documentation needed to make a determination regarding your continued employment… at the time of your suspension, many pages of Defendant documentation were discovered in your

personal locker. This documentation was determined to consist of Personal Health Information ("PHI") for patients." [Ex. 22; Ex. 41, Mitchem-Green Dep. Vol. II, 171:3-22].

However, Plaintiff was the only Clinician with Defendant who was not given a consistent, secure office space. [Ex. 41, Mitchem-Green Dep. Volume II, 52:7-25, 53:1-25, 54:1-25, 55:1-25, 56:1-4]. Every male Clinician with Defendant was given a personal office, whereas Plaintiff was only granted an unsecure desk. [Ex. 41, Mitchem-Green Dep. Vol. II, 176:21-25, 177:1-25, 178:1-5]. As such, Plaintiff did not have a secure location to keep her patients' protected health information. [Ex. 41, Mitchem-Green Dep. Vol. II, 123:4-6; Ex. 43, Campbell Dep. 42:6-11]. Eventually, Plaintiff began to use her personal locker for PHI, as it locked and was the most secure location Plaintiff had access to. [Ex. 41, Mitchem-Green Dep. Vol. II, 131:4-8; Ex. 44, Parrish Dep. 29:10-12]. It was reported that Health Services Manager Parrish subsequently stated that storing medical records in a locker was not unheard of, but in a later deposition HSA Parrish refuted this. [Ex. 43, Campbell Dep. 44:11-25, 45:1-12; Ex. 44, Parrish Dep. 31:7-10]. Plaintiff had never been previously warned of any issues regarding keeping PHI in her secure locker. [Ex. 47, Pltf. Aff., ¶ 46].

On September 23, 2017, Plaintiff received a call from Defendant's Human Resource Director Lynch and Regional Personnel Representative Ruth Feltner stating that Plaintiff was terminated effective immediately for the protected health information found in her locker. [Ex. 22; Ex. 41, Mitchem-Green Dep. Vol. II, 134:10-23, 171:23-25, 172:1-6]. However, Plaintiff was never given a reasonable opportunity to defend herself against this allegation. [Ex. 41, Mitchem-Green Dep. Vol. II, 133:22-25, 134:1-6].

## I.    STANDARD FOR SUMMARY JUDGMENT

A plaintiff will always survive summary judgment if he presents circumstantial evidence

that creates a triable issue concerning the employer's discriminatory intent. <u>Smith v. Lockheed-Martin Corporation</u>, 644 F.3d 1321, 1328 (11th Cir. 2011).

## II.  RACE AND GENDER DISCRIMINATION

Defendant analyzes Plaintiff's *prima facie* case under the <u>McDonnell Douglas</u> standards, claiming that Plaintiff cannot identify comparators. However, Plaintiff is not pigeonholed into a strict format in which to present her case. <u>See</u> <u>Lockheed-Martin</u>, 644 F.3d at 1328. But even under <u>McDonnell</u>, the shifting burdens are not intended to create substantial intermediate barriers but are "meant only to aid courts and litigants in arranging the presentation of evidence." <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 986 (1988). The Supreme Court has repeatedly emphasized that the plaintiff's initial burden of proving a *prima facie* case is "not onerous." <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 186 (1989); <u>Watson</u>, 487 U.S. at 986; <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

Even though Plaintiff is not required to show comparators, she can identify similarly situated individuals, in the other employees of Defendant who were all subject to the same policies and regulations. Plaintiff was allegedly she was terminated for keeping medical records in her locker. Every male non-black clinician was given a personal office, yet Plaintiff was only given an unsecured desk. Due to this, Plaintiff had no choice but to store medical records in her locker, the only space she was afforded that could be locked and secured. In addition, other male, non-black employees were given at least one assistant, where Plaintiff, in spite of her objections, was given no assistance with her workload. She was hindered from working in the infirmary and conducting confinement rounds, where all male non-black clinicians were permitted to perform work in those areas. Plaintiff was excluded from weekly provider meetings, yet male clinicians were requested to attend. Other employees were simply treated differently, even though they were supposed to be

subject to the same policies as Plaintiff.

In establishing whether Plaintiff is similarly situated to other employees, Lewis v. City of Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019), gives guidance. In Lewis, the Eleventh Circuit held that "a plaintiff must show that she and her comparators are 'similarly situated in all material respects.'" Lewis, 918 F.3d at 1224 (11th Cir. 2019) (citations omitted). In rejecting the "nearly identical" standard, the Lewis Court further explained that "[a]lthough we must take care not to venture too far from the form—'apples should be compared to apples'—we must also remember that '[e]xact correlation is neither likely nor necessary.'" Lewis, 918 F.3d at 1226 (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernandez, 367 F.3d 61 (1st Cir. 2004)). The court further explained that it was "not willing to take the risk that the nearly-identical test is causing courts reflexively to dismiss potentially valid antidiscrimination cases." Lewis, 918 F.3d at 1226. Finally, the Court held that the "[s]imilarly situated in all material respects" standard "will have to be worked out on a case-by-case basis, in the context of individual circumstances." Lewis, 918 F.3d at 1227.

It follows then, as the Lewis Court stated, that comparators need not have the same title. Lewis, 918 F.3d at 1227 (citing Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies.")). Accordingly, the Lewis Court provided a set of guidelines to shape the comparator inquiry, relying on previously established standards:

Ordinarily, for instance, a similarly situated comparator—

• will have engaged in the same basic conduct (or misconduct) as the plaintiff, see, e.g., Mitchell v. Toledo Hosp., 964 F.2d 577, 580,

583 (6th Cir. 1992) (holding that a plaintiff terminated for "misuse of [an employer's] property" could not rely on comparators allegedly guilty of "absenteeism" and "insubordination");

• will have been subject to the same employment policy, guideline, or rule as the plaintiff, see, e.g., Lathem, 172 F.3d at 793 (holding that a plaintiff's proffered comparators were valid where all were subject to the same "workplace rules or policies");

• will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the *1228 plaintiff, see, e.g., Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis"); and

• will share the plaintiff's employment or disciplinary history, see, e.g., Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 304 (6th Cir. 2016) (explaining that "[d]ifferences in experience and disciplinary history" can disqualify a plaintiff's proffered comparators).

Lewis, 918 F.3d at 1227–28.

Applying these guidelines, it is clear that Plaintiff has identified her identically situated coworkers who had offices, but she had a locker to keep her medications and other necessities for her job. It is up to a jury to make the determination as to whether these employees were treated more favorably than she was. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) ("We may not weigh conflicting evidence or make credibility determination of our own. If the record presents disputed issues of fact, the court may not decide them; rather, [we] must deny the motion and proceed to trial.") (citations omitted)); see also, Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1260, n.7 (11th Cir. 2012) (noting that the defendant "disputes a number of [plaintiff's] facts, but there is enough evidence to create a genuine issue for the jury as to each of them"); Morrison v. Amway Corp., 323 F.3d 920, 924 (11th Cir. 2003) ("In ruling on a Rule 56 motion, the district court may not weigh the evidence or find facts. Instead, the court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find

for the non-moving party."). In the instant case, ample evidence exists of disparate treatment, and different conduct by Defendant toward Plaintiff.

Further, courts are even more likely to find a prima facie case of race discrimination where the plaintiff has shown other evidence of discrimination. The proper inquiry in this case is "whether an ordinary person could reasonably infer discrimination if the facts presented remained unrebutted." Carter v. City of Miami, 870 F.2d at 583 (citing Goldstein v. Manhattan Industries, Inc., 758 F.2d 1435, 1443 (11th Cir. 1985)); see also Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981) (a plaintiff can satisfy his prima facie burden if replacement is only slightly younger if other circumstantial evidence supports an inference of discrimination, such as substantial evidence that he had satisfactory job performance). In this instance, the Plaintiff had performed her job well. She was subjected to limitations not put on male non-black coworkers. In spite of this she continued to provide a high level of care and was indeed criticized for spending too much time with patients to ensure their care. Yet, she was consistently not afforded the same advantages of male non-black employees. Certainly, an ordinary juror could infer race and gender discrimination where Defendant blatantly treated the Plaintiff differently than male non-black employees and where Plaintiff was subjected to disparate treatment by the non-black supervisors.

Plaintiff has put forth her prima facie case. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) (the burden upon the plaintiff to meet his prima facie case is not an onerous one).; see also, Vessels v. Atlanta Indep. School Sys., 408 F.3d 763, 769 (11th Cir. 2005) (same).

### III.   RETALIATION- TITLE VII AND CHAPTER 760, FLORIDA STATUTES

Title VII is a broad remedial measure, designed "to assure equality of employment opportunities." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973). The Title VII antiretaliation provision states:

> It shall be unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment… because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42  U.S.C. § 2000e-3(a).

The Eleventh Circuit has held that §2000e-3 should be interpreted broadly, stating that "[w]hile it is true that the language of a statute should be interpreted according to its ordinary, contemporary, and common meaning, this plain-meaning should not be applied to produce a result which is inconsistent with the policies underlying this statute." Bailey v. USX Corp., 850 F.2d 1506, 1509 (11th Cir. 1988) (internal citations omitted).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was some causal relationship between the two events. Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002). Plaintiff can meet all three elements. She filed a charge of discrimination on July 17, 2017 and she was fired 68 days later on September 23, 2017 when Plaintiff inquired about returning back to work. Without question, there is a disputed issue of material fact as to whether she was fired because of her EEOC filing.

Importantly, the causal connection is not "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action" that would "rise to the level of direct evidence of discrimination." Simmons v. Camden County Bd. Of Educ., 757

F.2d 1187, 1189 (11th Cir. 1985). Rather, this Circuit "construe[s] the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1278 (11th Cir. 2008) (quoting Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)). And, where the protected speech and adverse employment action are close in time, causation may be inferred. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("burden of causation can be met by showing close temporal proximity). But the bottom line is that the plaintiff must demonstrate a connection between his protected activity and adverse employment action that could "reasonably support [a] jury's determination." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).

## IV.   RETALIATION UNDER PRIVATE WHISTLEBLOWER STATUTE

Plaintiff also claims in this case that she was the victim of retaliation after reporting inmate abuse and substandard care of inmates. Her reports cannot be legitimately disputed. Plaintiff consistently complained, both verbally and in writing, about substandard patient care. In response, Defendant not only ignored her complaints, but sought to limit the time she could provide care to each patient. Defendant wished to afford each patient a mere fifteen minutes of care, regardless of the patient's need or ailments. In addition, Plaintiff became aware of inmate abuse by staff. When patient mistreatment continued and her complaints continued to be ignored, Plaintiff reported inmate abuse to an outside law enforcement agency. When the warden learned of this complaint, Plaintiff was suspended within an hour and a half. Plaintiff was escorted to her locker to empty it as part of her suspension, and it is only then that the medical records stored there were discovered, the alleged reason for her termination. However, the suspension and supervised exit from the facility has already been ordered, in direct response to Plaintiff's complaint to an outside law

enforcement agency.

Defendant takes issue with the way that she made her reports but that is a red herring. The fact that she did not make her reports in the correct format is not the issue- the issue is that she made these complaints in good faith and was fired for making them.  The Honorable Mark Walker, United States District Judge, Northern District of Florida, said it best on this topic:

> The parties dispute whether the FWA requires Plaintiff to prove she reported an actual violation of law, or only that she had a good-faith belief she was reporting an actual violation of law irrespective of whether Defendant's conduct was actually illegal.  The Supreme Court of Florida has instructed courts to construe the FWA broadly and to favor access to its remedy. Irven v. Dep't of Health and Rehab. Servs, 790 So. 2d 403,  406 (Fla. 2001); Martin Cty. v. City of Edenfield, 609 So. 2d 27, 29 (Fla. 1992). The Supreme Court of Florida has not, however, held either standard is the correct one to  apply in FWA cases. Florida's Fourth District Court of Appeal has held the "good faith"  standard is correct. Aery v. Wallace Lincoln-Mercury, LLC, 118 So. 3d 904, 916 (Fla.  4th DCA 2013). Florida's Second District Court of Appeal has disagreed in a dictum,  Kearns v. Farmer Acquisition Co., 157 So. 3d 458, 465 (Fla. 2d DCA 2015), but this neither disturbs nor conflicts with the Fourth District's decision. This Court's duty is thus to follow Aery. See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1021  (11th Cir. 2014) (explaining federal courts must follow the decisions of a state's  intermediate appellate courts where the state supreme court has not ruled on the correct  interpretation of the law).

O'Steen v. Fla. Sports Foundation, Inc., Case No. 4:19cv106-MW-MAF, Docket Number 48. Here, the record is clear that Plaintiff reported –internally, externally, verbally, and in writing – that she witnessed ongoing inmate abuse in violation of 42 U.S.C. § 1983 and federal laws protecting inmates from deliberate indifference to medical care.

The Defendant has accurately set forth the elements of a claim under §448.102, Florida Statutes, on ECF 21, pg. 18. Defendant primarily argues that Plaintiff cannot show a causal connection and that Defendant had a legitimate reason for her termination. Defendant is wrong.

In determining whether a plaintiff has produced prima facie evidence of causation, the courts have generally focused on two indicia: timing and evidence of ongoing antagonism. See Wideman v. Wal-Mart Stores, Inc., 141 F. 3d 1453 (11th Cir. 1998). Plaintiff "need only show that

the protected activity and the adverse action are not completely unrelated." Id., 141 F. 3d at 1457; see also Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999); Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998); EEOC v. Reichhold Chems., Inc., 988 F.2d 1564, 1571 (11th Cir. 1993). Where the protected speech and adverse employment action are close in time, causation may be inferred. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)("burden of causation can be met by showing close temporal proximity).

Defendant argues that Plaintiff is unable to show that "but for" her reports of inmate abuse and substandard care, she would not have been fired. The "but for" standard, however, does not mean "sole cause" – rather, caselaw demonstrates that it means a determinative factor and is not far removed from the "motivating factor." The Fifth Circuit Court of Appeals recently held in an ADEA case that "but for" does not mean "sole cause;" rather, it means that the protected activity or characteristic "was the factor that made a difference." Leal v. McHugh, 731 F.3d 405, 415 (5th Cir. 2013)(quoting Jones v. Oklahoma City Pub. Schs., 617 F.3d 1273, 1277 (10th Cir. 2010). The Supreme Court further expanded on what "but for" means, albeit in the context of a criminal matter, citing to University of Texas Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517 (2013. See Burrage v. United States, 134 S.Ct. 881, 887-889 (2014). Justice Scalia explained that a variety of factors may be at play in a given scenario, but if the other factors standing alone would not have produced the same outcome, then it was "but for" the final or determinative act – "the straw that broke the camel's back." Id. at 888. Thus, there is sufficient evidence in the record to show that "but for" her reports of inmate abuse and substandard care, she would not have been fired.

Moreover, timing is often relevant to the causation element of a retaliation claim. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir.1993). Although the timing of an employer's adverse employment action may not, by itself, provide *prima facie* evidence that an

adverse action is attributable to retaliatory motives, the temporal proximity between an employer's action and an employee's protected activity may permit an inference of causation where the relatively short interval between the two is "unusually suggestive" of retaliation. See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir.1997) (observing that temporal proximity alone may suffice to establish a causal connection if the timing of an employer's adverse employment action is "unusually suggestive" of retaliation); Martin v. Mecklenburg County, 151 Fed.Appx. 275 (4th Cir. 2005) (under circumstances in which the plaintiff alleged that the employer took action against him at the "first opportunity", court held that the question of whether an impermissible retaliatory animus at least partially motivated the employee's termination was for jury in the Title VII proceeding alleging that the employer discharged him in retaliation for protected activity). Here, there is no dispute that Plaintiff reported inmate abuse on August 29, 2017. Defendant has not yet produced the alleged email instructing her to submit an incident report to the Warden. However, the record is clear that by August 31, 2017, having taken no action to rectify or address the reported inmate abuse, Plaintiff then filed a report with the Sheriff's Office, again describing inmate abuse. She was immediately suspended – and the testimony is clear that her report was the actual and only catalyst for that suspension. Plaintiff has thus met her burden of showing that Defendant suspended Plaintiff within hours of her reports of abuse and substandard care. She was never returned to work thereafter.

**VII.**   **PRETEXT**

In order to show pretext, Plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision… [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly

by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). In evaluating a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir.1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)); see also, Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004) (stating plaintiff must produce "sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination.").

Defendant claims that Plaintiff was terminated in part for performance related issues. However, as stated above, Plaintiff was not allowed to have an office to keep necessary items to perform her job duties and she was not given the benefit of progressive discipline if she did anything wrong. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) ("We may not weigh conflicting evidence or make credibility determination of our own. If the record presents disputed issues of fact, the court may not decide them; rather, [we] must deny the motion and proceed to trial.") (citations omitted)); see also, Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1260, n.7 (11th Cir. 2012) (noting that the defendant "disputes a number of [plaintiff's] facts, but there is enough evidence to create a genuine issue for the jury as to each of them"); Morrison v. Amway Corp., 323 F.3d 920, 924 (11th Cir. 2003) ("In ruling on a Rule 56 motion, the

district court may not weigh the evidence or find facts. Instead, the court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party.").

A defendant's decisions to take adverse action against the plaintiff "does not become legitimate because it can be characterized as a business decision," E.E.O.C. v. Yenkin-Majestic Paint Corp., 112 F.3d 831, 835 (6th Cir. 1997), and the fact that the action is "harsh or unreasonable" is certainly probative evidence that the asserted reason may not be the actual reason animating the employer's decision. See e.g. Burdine, 450 U.S. at 259 (1981) ("[T]he fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination."); Wichmann v. Bd. of Trs. of S. Ill. Univ., 180 F.3d 791, 805 (7th Cir. 1999) ("[A] defendant cannot escape the fact that a jury must use its good common sense in addressing how much, if at all, the foolishness or unfairness of the employer's decision weighs in the evidence of pretext."). By granting even incredible explanations presumptive validity, the "business judgment rule" short-circuits this well-settled means of proving discrimination.

Here, Defendant claims that the main reason for Plaintiff's termination is due to her keeping medical records in her locker. First, Plaintiff was not afforded a secure office, like her male non-black coworkers. The only secure location available to Plaintiff for storage was her lockable locker. Second, when Plaintiff made a formal complaint to an outside law enforcement agency, she was immediately asked to collect belongings under escort and leave the facility. This occurred as soon as management became aware of her complaint of illegal activity. The alleged reason for Plaintiff's termination, the medical records in her locker, where not known to Defendant when the order came to ban her from the facility.

18

Moreover, Plaintiff was never warned, or counseled about storing medical records in her locker. Certainly, had Defendant known of her practice to secure records in this manner, and Defendant had an objection to such, Plaintiff would have been previously admonished and instructed not to do so. Here, Defendant was not aware of the stored records until after Plaintiff was ordered escorted out of the facility, and then the practice of securing the records in a locked locker was deemed so egregious as to warrant termination. Again, Plaintiff's male, non-black coworkers were given secure offices in which they could safely store medical records.

Alternatively, Plaintiff's co-workers are "comparable," in that they were all subject to the same policies as Plaintiff. It is well established that a plaintiff generally may show pretext by presenting evidence that a similarly situated employee outside the protected class was treated more favorably. See Berg v. Fla. Dep't of Labor and Employment Sec., Div. of Vocational Rehab., 163 F. 3d 1251, 1255 (11th Cir. 1998) (inconsistent application of policies may be evidence of discrimination). The trier of fact is permitted to consider the evidence establishing a plaintiff's *prima faci*e case and inferences drawn therefrom on the issue of whether the defendant's proffered reason is pretextual. See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000).

Defendant did not investigate male, non-black employees as to how they stored medical records under their care. Moreover, Defendant did not even investigate Plaintiff for the same, as it was discovered after Plaintiff had been ordered out of the facility and suspended within an hour and a half of management's discovery of Plaintiff's complaint of unlawful behavior by Defendant.

The acts committed against Plaintiff cannot be viewed in a vacuum; looking at the big picture, Plaintiff was treated differently than her coworkers from the start, and upon her complaining about substandard care and finally inmate abuse she was summarily terminated. See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) (en banc)

("workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context.").

Defendant's agents continually took exception to Plaintiff's reporting of law and policy violations. A jury could view Defendant's attempts to mitigate the inference of discrimination through its legitimate, non-discriminatory reason as suspect. See Harris v. Warehouse Services, Inc., 77 F.Supp.2d 1240, 1249 (M.D. Ala. 1999). Plaintiff has established the inconsistent application of policies as circumstantial evidence of discrimination as well as pretext. See Berg at 1255 (11th Cir. 1998); see also, Robertson v. Jefferson County Rehabilitation and Health Center, 201 F. Supp.2d 1172, 1178 (N.D. Ala. 2002) (where employees were subject to the same disciplinary rules and the defendant repeatedly disciplined Plaintiff but not other employees for conduct that was very similar to or worse than that committed by the plaintiff, genuine issue of fact existed precluding summary judgment). Genuine issues of fact remain as to whether Defendant's articulated non-discriminatory reasons are a pretext for discrimination and retaliation.

## CONCLUSION

Summary judgment should be denied on all claims, for the reasons stated above.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, Florida 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)

ATTORNEYS FOR PLAINTIFF

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

CM/ECF to all counsel of record this 6th day of December, 2020.

<u>/s/ Marie A. Mattox</u>
Marie A. Mattox